The next matter, No. 24-1138, National Historic Trust for Historic Preservation in the United States et al. v. Peter Paul Montgomery Buttigieg et al. At this time, would counsel for the Appellant's National Trust please introduce himself on the record to begin? Good morning. May it please the Court, my name is Christopher Cody on behalf of Appellants, and I'm joined today by my co-counsel Elizabeth Merritt. With your permission, I'd like to reserve two minutes for rebuttal. There you may. Thank you.  Appellants have pursued this appeal because of the staggering difference between the $13 million cost estimate for the construction of a new bridge that the agencies used while conducting their Section 4F limited scope reevaluation, and the $49.8 million that the agencies have actually agreed to pay for a new bridge. At stake is the historic 1932 Frank J. Wood Bridge listed on the National Register of Historic Places, which can be repaired and rehabilitated for continued use for dramatically less than the $49.8 million cost to construct a new bridge. The agencies argue that the scope of this Court's 2022 remand precluded them from using the best, most accurate cost estimate available to them when they conducted their Section 4F limited scope reevaluation. The Court should take note of the timing of events. The remand was issued on January 4, 2022, and was based on this Court's consideration of Appellee's $13 million cost estimate to construct a replacement bridge. Only four months later, in May of 2022, MDOT adjusted their budget estimate for the construction of a new bridge to $42.1 million, an increase of over 300 percent. Appellee FHWA then issued the draft limited scope reevaluation in July of 2022, using the stale, incorrect cost estimate of $13 million instead of their own $42.1 million cost estimate. So if we break this down, we gave a specific instruction to the agency to do something. And it seems, isn't it clear that the agency did that? Well, Your Honor, the remand instructed the agencies to make a decision. It didn't instruct the agencies to justify or further explain the conclusion that this Court had vacated and found to be arbitrary. It was not a decision in the abstract. It was a decision on whether a 53 percent difference is of an extraordinary magnitude. It wasn't just make a decision. It was decide that. And so those were the marching orders. True, Your Honor. But it was a decision, nonetheless, that they were bound by the APA to make in a non-arbitrary and capricious manner. Sure. I'm not sure you've answered my question. In your view, did the agency do precisely what we instructed the agency to do? I agree in that they made a decision. We believe that they made the decision in an arbitrary and capricious manner. So you're saying they didn't do what we told them to do? They justified the accounting methodology, as you requested, and then they made a decision. But really what they did was just restate their previous decision that had been vacated. They did not actually. Well, they didn't. We told them to address using the discounted numbers whether the 53 percent was sufficiently large or to say why they shouldn't use those numbers. And as I read it, they went back and they said the 53 is too large. So it seems to me they did exactly what we said. Well, the challenge is that the 53 percent cost differential doesn't exist in reality. Separate question. I'm just trying to clarify whether you have any argument that if they didn't do what we instructed them to do, you'd have an easy case, right? Well, our argument is that per Chenery, this was an opportunity to look at this problem afresh and take new agency action, and that by not using language, as in Homeland Security versus the University of California, to further explain their decision, by not asking them just to justify their decision, but rather by charging them to decide to make a new decision, they then have a responsibility to make that decision, to undergo that decision-making process in a non-arbitrary and capricious manner. It seems what you're arguing, although you seem reluctant to admit it, is that they did precisely what we told them to do, but in your view they had an obligation to have done more, and had they done more, the result would have been different. I can agree with that statement. I think the key there is that they had an obligation to do more, and the do more was to consider the accurate information. Where does that obligation stem from? The APA, the responsibility to not engage in arbitrary and capricious decision-making. Let's take that a step at a time. Certainly when we send it back and we say do X, and then they do X, an agency could very well feel that they're done if someone doesn't say something. As I understand it, you went in and tried to say something. You put in testimony saying the cost, the actual bid cost, is a lot bigger, and then you put in testimony trying to say that the rehab cost had not gone up commensurately. That's absolutely correct, and we argue that the agencies reopen the administrative record by considering our comments and by engaging their own expert to evaluate our arguments or our position as to the actual cost of rehabilitation. Additionally, a recognized circumstance warranting supplementation of the record is where evidence coming into existence after the agency acted demonstrates that its actions were right or wrong. And this right or wrong exception was established in the Tenth Circuit in American Mining v. Thomas, and it's been reaffirmed in the Tenth Circuit and cited in other jurisdictions. And the First Circuit should adopt this same standard of accountability for federal agencies. Let's go back to take it a step at a time to what happened here. It seems to me, looking at the record, that you actually succeeded in getting the agency's attention to your claim that there was a difference in cost and that the rehab cost hadn't gone as much. By presenting the testimony, you had an expert, Shalek, I think his name was, something like that. That's correct, Your Honor. And it looks like you succeeded in getting the agency to pay attention to that, but the agency came to a different view regarding it than you have and decided not to open things afresh. Why is that arbitrary and capricious? Wouldn't we approach that decision differently? Well, Your Honor, their comments, our estimate, our revised updated estimate that we offered was $19.8 million, and the agencies engaged their own expert who asserted that our estimate was slightly over $11 million undervalued. Even with $11 million added to our $19.8 million estimate, the cost of rehabilitation was still less than the $42.1 million budget and the $49.8 that they actually paid. But they seem to say there was a lot more wrong with Shalek's testimony than that. Well, I was just adding up the dollar numbers that they were able to assert were not there to make the point that even taking their expert's testimony as to the rehabilitation estimate as true, it is still dramatically cheaper by millions of dollars to rehabilitate the bridge than to build a new one. It is only their persistent refusal to budge from the entirely fallacious $13 million estimate from new construction that's shielding them. Does the 4-F inquiry include more than just the dollar amounts? There were arguments about, one, there's a persistent safety issue that may attach to the old bridge that won't attach to the new bridge. Two, what we would need to do for the old bridge is contingent on predictions about what Maine will do to fund certain investigations that would have to happen. And we don't know that. We're not confident about that. How does all of that, you're talking dollars and cents, but it seems like this decision is more multifactored and some things aren't as easily reduced to dollars and cents. So the feasibility of rehabilitating the bridge is not in question. That has been conceded. Bridges like this have been rehabilitated all across the country. It's the cost that exclusively was the determinative factor here, and the court's remand was limited to vacating the cost analysis. So that is the very specific singular point rather than feasibility concerns that's at issue here in this limited scope 4-F reevaluation. In your brief, you say three or four times that the agency asserts that the cost of the rehabilitation had only doubled. I couldn't find any support for that. The additional costs that their expert asserted were not included in our $19.8 million re-estimate by Mr. Shulock, again, added up to slightly more than double the original estimate as opposed to... But did the agency, as you say in your brief, assert that the cost of the rehab had only doubled? Yes, they did. By saying that our $19.8 million was undervalued by slightly more than 11, they're saying that really it's a $40 million rehab versus we had originally assigned $20 million for it in our initial argument. So you're saying they implicitly said that because as you value what they were criticizing, it's only $11 million? That has rounded the amount that they said our experts cost estimate for rehabilitation. Can you maintain they agree with that? That is what they included in the limited scope re-evaluation as their critique of our rehabilitation cost estimate. Well, we also note that the supplementation of the record that we're asking for is not a substantial new foray or a fishing expedition or unjustified obstructionism, which is what the court feared in Vermont Yankee Nuclear Power Corporation versus NRDC. We are asking for an incredibly finite supplementation of the record with their own cost estimate, or better yet, the actual amount that they have already paid for this bridge. And this is the singular determinative point upon which this 4F evaluation turned. They explicitly said that the rehabilitation alternatives were dismissed solely because of their cost. So if you read the case law about when the administrative record should and shouldn't be supplemented, when the administrative record was reopened, when the courts find that it was reopened, the fear expressed by courts is this unjustified obstructionism. That's absolutely not what's happening here. It's not surprising that construction costs raise over time, whether it's for rehab or new construction. Certainly, but in this case, the costs that were raised were the costs of steel. It went up by over 200 percent, and that's a cost that you have to buy more steel for a new bridge than to repair an existing one. The cost of cofferdams went up from just over a million dollars to over eight, which is also something that you don't have to do for rehabilitation. Sure, but there's maintenance that cuts the other way. But anyhow, costs are, if we look back over the last 30 or 40 years, costs make a pretty steady upward ride of construction or rehabilitation. So if we take your position, even if we agreed with you now and sent it back and they did it with the new bid figures and everything, by the time that got finalized and came back to us, costs would have gone up yet again. So in theory, they should start over yet again and again, and it would never end. Doesn't there have to be some particularly persuasive reason to say, not only have costs gone up, but they've gone up in a disparate way, and we have credible evidence of that that persuades the agency? Only then would the agency need to reopen. Well, that is, in fact, where we asserted that they went up in a disparate way, that the cost of new construction had gone up more. What if the agency didn't buy that and critiqued it? Don't we review that for substantial evidence? The agency, interestingly, offered comments and a critique of it while also refusing to actually consider any of these arguments. They said, you know, we are only going to look at the original estimates, and what we're asking them to do is to, in fact, engage. We believe that they were required by their demand to engage in an actual decision-making process to consider exactly what you described. That seems sort of like a harmless kind of thing. So, no, we don't think we have to do that. But we're going to look at it, and it doesn't change our view, so we're sticking with the original thing. I mean, that just seems like make work, because they did, as you point out, they did do work around it. They did get the DOT person to examine it and point out flaws. And I guess my concern is sort of echoing what Judge Kayada just said, which is every day is a new day. The costs change. I mean, there should be a day, a time, that we decide we're going to use because this is always in flux. And it seems to me that in the administrative world, that's when the agency made the decision. I understand what you're saying, but it seems like otherwise this is just a never-ending circle. Your Honor, may I respond? Yeah, please go ahead. The moment when they should have looked at the evidence and made that decision was when they were doing the Section 4F limited scope re-evaluation. And what is your response to what Judge Kayada said, which is if we agreed with you and sent it back, and now they say, well, whichever direction. I mean, he said it's always this way, but I acknowledge maybe inflation goes the other way. Then what? Do we just start over again? Well, Your Honor, I don't think it's a perpetual start over, start over, start over. I think it's do the 4F re-evaluation using the information that's available to you at the time of that agency action. And again, we're not asking for a perpetual do-over. This isn't a gamesmanship strategy. This is asking for an extremely finite use of the best information that's available to the agency at the time of their decision-making. Thank you. Okay, thank you. Let's hear from counsel for Appalese. Would counsel for Appalese, Buttigieg, et al., please introduce himself on the record to begin? Yes, may it please the Court. John Arbab for the Federal Appalese. With me at counsel's table is Tom Knowlton on behalf of the State Appalese. Your Honors, complying with the Court's strictly limited remand in the prior appeal, Federal Highways reasonably determined that the rehabilitation alternative's 53 percent higher cost is a cost of extraordinary magnitude and therefore not prudent under the governing Section 4F regulation. As the Court explained in the prior appeal, that kind of a 4F judgment by Federal Highways is reviewed under the highly deferential abuse of discretion standard. And here we maintain that on remand, Federal Highways acted within its discretion in rejecting the rehabilitation alternative, and the District Court's judgment should be affirmed. Now, I'd like to make three points in addition to answering the Court's questions. First of all, I think it's important to remember in the Court's prior decision that the Court rejected plaintiffs with the Court characterized as, quote, slew of line item challenges to various calculations of costs for each alternative. That is, Federal Highways' calculations of the costs for the rehab versus replacement alternatives. And that's at 22F 4th 281. And then the Court remanded to Federal Highways, again, I'll quote, for the strictly limited purpose of allowing the agency to further justify use of the service life analysis and or to decide whether a 53 percent price differential represents a cost of extraordinary magnitude under 23 CFR 774.17, unquote. And that's at 22F 4th 286. Now, the 53 percent price differential that the Court referred to, or also referred to by the Court as the 53 percent delta, is the 53 percent higher cost of the rehabilitation alternative based on cost estimates in the existing administrative record using life cycle cost analysis. So on remand, Federal Highways complied with the strictly limited remand order. The agency fulfilled the second half of the and or remand order that I just referred to by expressly determining, quote, that the 53 percent difference in life cycle cost represents a cost of extraordinary magnitude and therefore is not a prudent alternative. And that's at Appendix 106. Federal Highways fully explained its reasons for coming to that conclusion on the strictly limited remand. And I can quote some of the... So your friend says, yep, Judge Kayada, sort of I think he agreed with Judge Kayada. It says what it said. But then he said, but there's sort of an obligation to engage in decision making that has some connection to the real world. And he says the real world completely changed from when this Court issued its remand order. So whatever the narrow remand order was, it was a further obligation to engage with, I think they would say, the real world, which are these costs. So to me, that's really where their argument is. So what is your response to we don't have an obligation to deal with sort of the costs as they are today? In addition to, you know, are you just limited to the remand order? You don't have the authority to do anything else? Or you do have the authority, but you chose not to exercise it? Your Honor, it's questionable, given the strictly limited nature of the remand, whether Federal Highways could have, as the Supreme Court in the Department of Homeland Security case said, started afresh on remand with respect to costs. Didn't you moot that issue by, in effect, looking at the reason that was put forward to go afresh and critiquing it and finding it unpersuasive? Your Honor, the agency, I would submit, engaged in good government and transparency by engaging with the so-called Schulach estimate that the plaintiffs put forward. But the agency at the same time made it clear that plaintiffs' comments were not relevant to the remanded issue and explained that Federal Highways was addressing plaintiffs' comments simply to, quote, unquote, respond to concerns, unquote, not to render a decision on the remanded question. So plaintiffs put forward the Schulach estimate, and Federal Highways did the conscientious thing, which was not to ignore it, but to engage with it without reopening the record as to new cost estimates. And the agency gave very pointed critique of the Schulach estimate, finding that it ignored certain costs in coming up with the $19 million current figure for the replacement alternative. It ignored certain costs. It wasn't clear that Schulach had used proper lifecycle analysis in putting a present value on future maintenance costs. The agency pointed out that Schulach's comparison of a bridge in New Hampshire to this project was inapposite and gave reasons for that. So in the brief, we detail the numerous ways in which the agency. Do you think you had the power to take out, let's assume you didn't have all those problems with Schulach and you thought it was right, just assume that. Do you think the agency has the power in the circumstances we find ourselves to reverse its decision, say 53 percent is no longer the right number, it's a different number, and we come up with a different conclusion based on that? As I mentioned, I think ordinarily the agency, as the Supreme Court said in the Department of Homeland Security case, can always decide to start afresh on remand. It's more doubtful in this case, given the strictly limited remand that the court had entered, but maybe if we put aside for a moment the strictly limited remand aspect of this, then I do think the agency would have had authority, discretion to say. And I guess that's my question, because I do think there is a strictly limited remand. Does that then limit the agency only to the question posed, or did it still retain the power to do something else? I don't think the court needs to decide that here, but I think that even with the strictly limited remand order, the agency probably had discretion to go beyond it, but that's just not what the agency did here. So the court doesn't need to decide that question, as I mentioned. And then that leads to my question, I guess, which is the ultimate question. I mean, if that's true, is that decision not to go further judged under some kind of arbitrariness sort of review? I think so, Your Honor. The ultimate 4F determination, as the court explained in the previous appeal, is given deferential review under an abuse of discretion standard, and the agency just didn't abuse its discretion here. It engaged with Shulock, pointed out why his estimate was not sound, and then complied with this court's strictly limited remand. Let me ask you about the abuse of discretion. Here you have the remand order. So is it a bit more difficult to argue abuse of discretion when there's a remand order specifically telling the agency what to do versus a case where the agency acts and still hasn't been reviewed by a court? Yes, Your Honor. I think really I agree with you. The bottom line is that the agency can't really be found to have abused its discretion for carrying out this court's strictly limited remand order. That's kind of what the bottom line is here. Unless there are further questions, I would just ask that the district court's judgment be affirmed. Okay. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the appellee, Van Note, please introduce himself on the record to begin. He has a five-minute response. Good morning, Deputy Attorney General Thomas Knowlton for Maine DOT Commissioner Bruce Van Note. Plaintiffs have forfeited any argument that Federal Highways reopened the record and conducted a new independent decision-making process. They failed to make such an argument in their complaint, in their summary judgment papers, in their motion for preliminary injunction, in their motion for extraordinary relief to this court, and either of their motions for extraordinary relief to this court. So having failed to raise those arguments below, they may not bring them for the first time before this court. In any event, the record shows that Federal Highways' determination that a 53 percent price differential constituted an additional cost of extraordinary magnitude was based on the existing record from 2019. That's in the appendix at 94 through 107. But as counsel for the Federal appellees pointed out, the agencies opted to respond to certain comments that were made during the process. And those responses to comments are actually in a separate section of the reevaluation document near the end, a separate section called Summary of Comments and Responses, where the agency summarized Mr. Schulach's new price estimates and pointed out various errors in them. By doing so, the agencies engaged in a reasonable process and did not open up the door to allow plaintiffs to inject costs from 2022 and 2023 into this case. Under the plaintiff's view of Section 4F, this process would never end. There would constantly be new cost estimates that they would be demanded, and by the time they got to this court, they'd be saying those cost estimates are stale. There needs to be an end to the administrative process. Federal Highways did exactly what this court directed on remand. The only other point that we would point out, Your Honor, is that plaintiff's opening brief and reply brief contains numerous numbers purportedly of estimated costs of the replacement and rehabilitation alternatives. Those cost figures are unsupported by the record, inaccurate, and as Federal Highways pointed out, ultimately irrelevant in light of the strict remand that was ordered by this court. Let me also ask you, you mentioned and we've mentioned there's a strict remand order. If the appellants had any issue, wouldn't the remedy be to ask this court way back then, can you modify the order or reconsider the order or make it more specific? And that didn't happen. That did not happen, Your Honor. The 53% differential was baked into this court's 2022 opinion. That was the underlying predicate for it after this court rejected the slew of line-item challenges that the plaintiffs made the first go-round. Anything else? If there are no other questions, Your Honor, we ask this court to affirm the district court judgment. Thank you. Okay, thank you. Two minutes for rebuttal. Counsel, please reintroduce yourself on the record to begin. Thank you. Christopher Cody for appellants. First of all, as to the forfeiture argument, there's a difference between a claim and an argument, and we clearly preserve the claim that we now are arguing the supplementation of the administrative record under, which is contesting the 4-F cost analysis. And opposing counsel just conceded that they decided that they made a decision. That's a pretty broad conception just because we challenged the 4-F means. We get to say anything, including that the administrative record was reopened, and we never told anybody that, and now we show up here and say that. I mean, I understand your point, but it seems like there's some obligation to make, I mean, at the highest level generally, yes, you're challenging the overall determination, but at a second level like why seems to be something that you should have to at some point say. I agree, Your Honor, and I think here the why of why we are challenging the 4-F was that the cost analysis was inaccurate. So there is a second gradation, a more specific claim here under just a general, not just a general 4-F claim. Opposing counsel just essentially conceded that they decided to not consider reality on remand, that they had the ability and the discretion to consider that, and they simply made a decision not to, and they conceded that that decision would be subject to an arbitrary and capricious standard. And it is clearly arbitrary and capricious when you have your own estimate before you and are deciding not to use the best information available to the agency. And this is also not a minor matter. This is a gross difference between the amount that is currently on the administrative record and what is happening in reality and what's actually getting paid for with public money for this bridge. So if we sent it back, should they use the 22 figures? If you were to send it back, we would simply ask for a proper section 4-F review and to answer the question that was raised earlier during opposing counsel's argument about when does 4-F end. 4-F ends when there is a proper 4-F review done according to law and using the best information available to the agency at the time. I'm not sure I heard the answer to my question. Should they use the 22 figures if we send it back? We would argue that they should use the most accurate figures available to them, which right now is the $49.8 million that they've actually paid. So if someone submits the 25 construction costs that are materially different, they should use that instead. I don't think that we have to guess at 2025 costs because they've actually paid for it already. So we have a clear, discrete fact that we're asking them to consider. Thank you. Thank you. Okay, we're going to take a five-minute break.